**S.Q.K.F.C., INC., Plaintiff–Appellant,**

v.

**BELL ATLANTIC TRICON LEASING CORPORATION, Defendant–Appellee.**

No. 775, Docket 95–7533.

United States Court of Appeals, Second Circuit.

Argued Dec. 21, 1995.

Decided May 28, 1996.

630

Stephen T. Mangiaracina, Howard Beach, NY, for Plaintiff–Appellant.

Douglas J. Good, Mineola, N.Y. (Ruskin, Moscou, Evans & Faltischek, P.C., Mineola, NY, David T. Maddox, Timothy Berg, Kendis K. Muscheid, and Fennemore Craig, Phoenix, AZ, on the brief), for Defendant–Appellee.

Before KEARSE, MAHONEY and PARKER, Circuit Judges.

PARKER, Circuit Judge:

Plaintiff S.Q.K.F.C. is a family-held corporation that owns and operates eleven Kentucky Fried Chicken franchises. After twice attempting to obtain a commercial loan from Bell Atlantic TriCon Leasing Corporation ("TriCon"), S.Q.K.F.C. brought this action against TriCon in the United States District Court for the Eastern District of New York, Eugene H. Nickerson, *Judge*, alleging: (1) violations of § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.;* (2) common law fraud in the inducement to contract; and (3) violations of New York General Business Law § 349 (McKinney 1996). According to the complaint, TriCon defrauded S.Q.K.F.C. and other similarly situated consumers by offering unrealistically generous preliminary loan terms to lure them into exclusive negotiations. The district court dismissed the complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). Because S.Q.K.F.C. failed to adequately allege a fraudulent or deceptive practice on the part of TriCon, we affirm.

## I. BACKGROUND

In April of 1993, S.Q.K.F.C. contacted Bell Atlantic TriCon Leasing, then a wholly-owned subsidiary of Bell Atlantic Capital Corporation, to discuss the possibility of borrowing money to expand and improve its restaurants, and to refinance loans made by family members.[1] The parties arranged for a meeting between Joseph R. Panzarella, S.Q.K.F.C.'s president, and Charles Fletcher, an account executive for TriCon. At the meeting, which took place on May 6, Panzarella explained to Fletcher that S.Q.K.F.C. wanted to obtain a loan without executing individual guaranties. Fletcher told Panzarella that he thought this was possible, though he would have to check with his boss.

On May 7, S.Q.K.F.C. received a mailing from TriCon, which included materials described as a standard document loan package and a sample individual guaranty. Shortly thereafter, Fletcher telephoned Panzarella to tell him that TriCon had reviewed S.Q.K.F.C.'s financial records and the Kentucky Fried Chicken franchise documents, and had determined that no individual guaranty would be required as a condition of the loan agreement.

On May 27, TriCon sent two written loan proposals to S.Q.K.F.C., the first to finance the construction of a new franchise, the second to finance a franchise renovation and an additional new project. Consistent with Fletcher's oral representation, each proposal stated that "[n]o personal guaranties will be required with this loan." However, the proposals were explicitly subject to several "terms and conditions." For example, they stated that commitment would only issue upon written approval of the Senior Review Committee as to "pricing, term, structure, credit and other conditions, including but not limited to *requirements and guarant[ie]s and/or other collateral to secure the obligations.*" (emphasis added). The proposals also contemplated the possibility of an outright rejection of S.Q.K.F.C.'s loan application: "If we do not approve your application, the application fee will be refunded...." And each explicitly stated that "[t]his letter does not constitute a commitment by [TriCon]." In addition, although the proposals at one point stated that personal guaranties would not be required, at another point they indicated that "all of your obligations to us shall be unconditionally guaranteed by: To be determined."

On July 2, Panzarella executed the loan proposals on behalf of S.Q.K.F.C. and mailed them to TriCon along with a check for fees in the amount of $11,600.

On August 22, prior to issuance of any commitment from TriCon, the company notified Panzarella by telephone, facsimile, and mail that personal guaranties would be necessary in order for the loans to close. S.Q.K.F.C. refused to provide the guaranties, and the deal fell through. TriCon returned plaintiff's check in full on September 1.

---

1. TriCon Leasing has since been merged into FINOVA Capital Corporation, a wholly-owned subsidiary of the FINOVA Group, Inc.

Three months later, S.Q.K.F.C.'s shareholders once again decided to attempt to obtain a loan through TriCon, even if personal guaranties would be required. Panzarella called Fletcher, who indicated that a loan could be completed within as few as thirty days. Fletcher did not send plaintiff a new set of sample loan documents. TriCon sent a Commitment Letter to plaintiffs on January 25. It differed from the July loan proposal in several respects, most notably in that it listed Joseph R. and Angela Panzarella as personal guarantors. Panzarella executed the proposal under a notation "Agreed and Accepted" and mailed a check.

By February 11, TriCon was prepared to close the loan. Its attorneys mailed numerous documents to S.Q.K.F.C.'s attorney, including a proposed form of individual guaranty. According to S.Q.K.F.C.'s complaint, this individual guaranty was materially different from the sample guaranty received by S.Q.K.F.C. on May 7, 1993. It allegedly contained four new terms: a guarantor waiver of rights, covenants of guarantor, events of default, and a New Jersey forum selection clause. S.Q.K.F.C. alleges that, in spite of its protests, TriCon refused to remove these terms. An attorney for TriCon told S.Q.K.F.C. that the company had been using the individual guaranty form "for years and years [and] for hundreds and hundreds of loans." Because the Panzarellas refused to sign the individual guaranty, the loan was never finalized.

S.Q.K.F.C. obtained a loan elsewhere, but only after incurring great expense in reliance on its negotiations with TriCon. It filed suit alleging that TriCon had: 1) violated § 1962(c) of RICO, 18 U.S.C. §§ 1961 *et seq.*, by engaging in a pattern of racketeering; 2) committed common law fraud in the inducement to contract, and 3) violated § 349 of New York General Business Law, by customarily defrauding consumers. The district court dismissed these claims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), on the ground that plaintiff had not alleged fraud with sufficient particularity, and, for purposes of the New York General Business Law claim, had not alleged that TriCon's misrepresentations affected the public interest and were recurring in nature. This appeal followed.

## II. DISCUSSION

### A. *Plaintiff's RICO and Common Law Fraud Claims*

In order to state a RICO racketeering claim, a plaintiff must allege that a defendant, "employed by or associated with" an enterprise affecting interstate or foreign commerce, conducted or participated in the conduct of this enterprise's affairs "through a pattern of racketeering activity." 18 U.S.C. § 1962(c); *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). The RICO statute defines "racketeering activity" to include acts which are indictable under 18 U.S.C. § 1341, relating to mail fraud, or 18 U.S.C. § 1343, relating to wire fraud. 18 U.S.C. § 1961(1)(B).

S.Q.K.F.C. based its RICO claim on allegations that TriCon engaged in mail and wire fraud when it made "fraudulent and misleading representations, intending to induce plaintiff to borrow money from defendant." A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme. *United States v. Gelb*, 700 F.2d 875, 879 (2d Cir.), *cert. denied*, 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983). S.Q.K.F.C. also alleged that TriCon committed common law fraud. To successfully plead a common law fraud claim, plaintiff must allege a "material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities*, 835 F.2d 966, 970–71 (2d Cir.1987).

Since the district court dismissed these claims pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), this court engages in a *de novo* review of the pleadings. *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 593 (2d Cir.1993) (citation omitted). The pleadings are deemed to include both the complaint, and any documents attached to it

as exhibits. *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir.1985).

S.Q.K.F.C. claims to have been defrauded by a "bait and switch" tactic employed by TriCon. According to this theory, TriCon lured S.Q.K.F.C. into negotiating exclusively with TriCon by making false promises and providing preliminary loan proposals with attractive terms. Then, at the last minute, after S.Q.K.F.C. had "invested time and resources in gathering the required financial documents and sent thousands of dollars to [TriCon]", TriCon changed the terms of the loan to the detriment of S.Q.K.F.C. S.Q.K.F.C. points to two examples of such allegedly fraudulent behavior. The first is when, during the first round of loan negotiations, TriCon "purposefully misled" S.Q.K.F.C. into believing that no personal guaranties would be required so that S.Q.K.F.C. would not seek out another lender.

■ In order to successfully plead this fraud claim, S.Q.K.F.C.'s complaint must specify the circumstances constituting fraud "with particularity." Fed.R.Civ.P. 9(b). In addition, it must allege facts that give rise to a strong inference of fraudulent intent. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). It can do so by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Id.*

■ A review of the documents relating to the initial negotiations, which are attached to S.Q.K.F.C.'s complaint, severely undercuts any inference of fraudulent intent on the part of TriCon. After their initial meeting, Fletcher is alleged to have told Panzarella that personal guaranties would not be required to finalize the loan. However, he followed up with a written proposal that made it clear that several conditions had to be met before TriCon could make a firm offer. The proposal explicitly stated that it did not constitute a commitment by TriCon, and that several conditions would have to be met before a loan was approved. Most notable among these was "written approval of our Senior Review Committee, as to pricing,

term, structure, credit and other conditions, *including but not limited to requirements and guarant[ie]s* and/or other collateral to secure the obligations." (emphasis added). Although in one place the proposal stated that "no personal guaranties [would] be required with th[e] loan," in another place it said that "all of your obligations to us shall be unconditionally guaranteed by: To be determined." The proposal also contemplated the possibility of S.Q.K.F.C. failing the credit check altogether: "If we do not approve your application, the application fee will be refunded...." Finally, the proposal specifically stated that the "letter does not constitute a commitment by us." The very conditional nature of this proposal undermines the allegation that TriCon was trying to mislead S.Q.K.F.C. into believing that the deal was final. These allegations alone do not provide a sufficiently strong inference of fraudulent intent to satisfy the heightened pleading requirements of Rule 9(b).

S.Q.K.F.C.'s fraud claim was also based on its claim that the sample guaranty it received from TriCon through the mail on May 7, 1993 contained more favorable terms than the actual individual guaranty offered to the Panzarellas in February 1994. Specifically, S.Q.K.F.C. alleges that "[t]he sample Individual Guaranty did not include paragraph 3(d) (Guarantor waiver of rights), paragraph 7 (Events of Default), Paragraph 13 (Covenants of Guarantor) and paragraph 17 (Venue-agreement to be sued in New Jersey)."

This allegation does not suffice to state a fraud claim for several reasons. First, TriCon had not told S.Q.K.F.C. that the May 7, 1993 sample guaranty forms, which had been provided to S.Q.K.F.C. in connection with the first set of loan negotiations, were relevant to the second set of negotiations. (The first round of negotiations was terminated in August, 1993, resulting in the refund of S.Q.K.F.C.'s deposit. The second set of negotiations began in December, 1993.) S.Q.K.F.C. had reason to question the continuing significance of TriCon's earlier representations—the January Commitment Letter signed by S.Q.K.F.C. specifically "cancel[ed] and supersede[d] all previous commitment/proposal letters." Second, the January

Commitment Letter was conditioned on the "approval of our counsel of all documentation and other requirements set forth herein." Finally, TriCon had notified S.Q.K.F.C. that the May 7 sample documents represented standard *real estate* loan documents. The loan negotiated between S.Q.K.F.C. and Tri-Con in January involved three transactions, one for real estate, and two for equipment and leasehold improvement. Thus, S.Q.K.F.C. had reason to believe that the individual guaranty might well differ from the sample provided during its initial negotiations with TriCon.

Furthermore, a comparison of the May 7 sample guaranty with the actual guaranty presented to S.Q.K.F.C. in February reveals that S.Q.K.F.C.'s misrepresentation claim is extremely misleading. The sample guaranty in fact contained most of the terms challenged by S.Q.K.F.C., albeit in slightly different form.

For example, in regard to a guarantor waiver of rights, the actual guaranty provided that "[g]uarantor expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which Guarantor may now or hereafter have...." The sample guaranty contained a very similar term: "Guarantor shall have no right of subrogation, reimbursement or indemnity whatsoever and no right of recourse to or with respect to any assets or property of the Debtor...." S.Q.K.F.C. complains that the actual individual guaranty "is unreasonable and unconscionable. It requires the guarantor to relin[q]uish all rights to reimbursement from the debtor corporation or anyone else, thus precluding contribution from the co-guarantor and/or indemnification agreements with the other shareholders." However, the sample guaranty terms had virtually the same effect.

S.Q.K.F.C.'s claim that the sample guaranty did not contain a New Jersey forum selection clause is a blatant misstatement. Although there was not a section specifically entitled "Venue," the sample provided that: [t]his instrument shall for all purposes be governed by and interpreted in accordance with the laws of the State of New Jersey.

Guarantor consents to the jurisdiction of any Federal Court in the State of New Jersey or any State Court located in Bergen County, New Jersey with respect to any legal action commenced hereunder.

In addition, the "Events of Default" clause in the actual individual guaranty was almost identical to a term found in the sample guaranty. The individual guaranty itself provided that:

If Guarantor or Debtor should at any time become insolvent or make a general assignment for the benefit of creditors, or if a proceeding shall be commenced by, against or in respect of Guarantor or Debtor under the Federal Bankruptcy Code or any state insolvency law, or if any individual Guarantor dies, any and all of Guarantor's obligations under this Guaranty shall, at TriCon's option, forthwith become due and payable without notice.

The Sample Guaranty did not have a separate "Events of Default" paragraph. Nevertheless, its paragraph entitled "Primary Nature of Guaranty" contained almost identical language. The principal difference between the two provisions is that the sample did not contain the phrase "or if any individual Guarantor dies." At oral argument, TriCon provided an explanation for this modification: the sample guaranty form contemplated only one guarantor. The addition of a second guarantor leads to the inclusion of an additional term. In fact, it is not clear that this explanation is satisfactory, as there are not one, but *two* signature lines on the sample guaranty form. However, as indicated above, TriCon had not told S.Q.K.F.C. that the sample documents provided in connection with the first round of loan negotiations were relevant to the second round. In addition, the Loan Commitment Letter provided to S.Q.K.F.C. made it clear that none of the documents were final.

Only one section of the individual guaranty cited by S.Q.K.F.C. was, in fact, entirely absent from the sample guaranty: the "Covenants of Guarantor." This provision states that the guarantor represents that all financial and other information furnished to Tri-Con was, at the time of delivery, true and correct. It also requires the guarantor to

provide TriCon with annual financial statements within ninety days of the end of each calendar year and other such financial or credit information "as TriCon reasonably requests" until the loan is paid in full.

So, aside from the addition of this clause and the "death of a guarantor" event of default provision, the sample guaranty S.Q.K.F.C. received on May 7 contained terms very much like those S.Q.K.F.C. claims were divulged at the last minute—a similar waiver of rights, a nearly identical "Events of Default" clause, and a clear New Jersey forum selection clause. Thus, insofar as S.Q.K.F.C.'s fraud claim is grounded in the May 7 sample guaranty form, it can only be based on the addition of these two contract terms.

We find that the addition of these terms does not suffice to raise a "strong inference of fraudulent intent" on the part of TriCon. As for the "Covenants of Guarantor", it seems unlikely that a borrower would back out of a loan based only on a requirement that the guarantor provide periodic financial data to the lender. Consequently, TriCon had no motive to purposefully and fraudulently conceal this term until the last minute. The "death of a guarantor" clause might well be of greater concern to potential borrowers. However, given that the sample relied on by S.Q.K.F.C. was provided by TriCon in conjunction with a different loan negotiation, that it specifically stated that it was for real estate loans, and that the Loan Commitment Letter was explicitly conditional, the addition of this term does not give rise to a strong inference of fraudulent intent.

S.Q.K.F.C. has failed to meet the heightened pleading standards of Rule 9(b). Therefore, the district court correctly dismissed its RICO and common law fraud claims.

### B. *New York General Business Law § 349*

■■■ Section 349 of New York State's General Business Law provides a private right of action for injuries to consumers resulting from deceptive practices. To state a claim under this section, a plaintiff must allege that (1) defendant has engaged in an act or practice that is deceptive or misleading in a material way, and (2) plaintiff has been injured by reason thereof. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 532, 647 N.E.2d 741, 744 (N.Y.1995). The first element requires a showing that a reasonable consumer would have been misled by the defendant's conduct. *Id.* at 26, 623 N.Y.S.2d at 533, 647 N.E.2d at 745.

■■■ The district court dismissed S.Q.K.F.C.'s § 349 claim on the ground that S.Q.K.F.C. failed to plead facts suggesting that TriCon's alleged misrepresentations affect the public interest and are recurring in nature. In so holding, the district court overlooked the New York Court of Appeals' recent decision in *Oswego*, in which the court held that "[p]laintiff ... need not show that the defendant committed the complained-of acts repeatedly—either to the same plaintiff or to other consumers—but instead must demonstrate that the acts or practices have a broader impact on consumers at large." *Id.* at 25, 623 N.Y.S.2d at 532, 647 N.E.2d at 744; *cf. Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995) ("The critical question [under § 349] is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor."), *cert. denied*, —— U.S.——, 116 S.Ct. 916, 133 L.Ed.2d 846 (1996). This requires a finding of conduct that is "consumer-oriented," defined as conduct that "potentially affect[s] similarly situated consumers." *Id.* at 26, 623 N.Y.S.2d at 533, 647 N.E.2d at 745. In this case, TriCon's alleged conduct potentially affects franchisees that, like S.Q.K.F.C., are interested in obtaining a commercial loan. It is unclear whether franchisees qualify as consumers for the purpose of this statute, which was not intended to be a "sword to be wielded in business-versus-business disputes ... where the party asserting the claim is not acting in a consumer role." Richard E. Givens, *Overall Scope of General Business Law §§ 349–350*, Supplementary Practice Commentaries 166, 167 (McKinney Supp.1996).

■■■ Nevertheless, the district court's dismissal of this claim should be affirmed on alternate grounds: a reasonable consumer

would not have been misled by TriCon's conduct. We begin by reiterating that the majority of S.Q.K.F.C.'s allegations are belied by the exhibits attached to their complaint. TriCon's sample guaranty contained extensive waivers, a lengthy list of events of default, and a New Jersey forum selection clause. Thus, S.Q.K.F.C.'s § 349 claim can only rest (1) on Fletcher's initial representation that no individual guaranties would be required, (2) on the absence of the "Covenants of Guarantor" section in the sample guaranty, and (3) on the addition of the "death of a guarantor" provision in the actual guaranty.

These facts alone do not sufficiently allege a deceptive practice on the part of TriCon. As for the first claim, Fletcher followed-up his initial statement that no guaranties would be required with written correspondence making it very clear that several conditions had to be met before TriCon could commit to any loan terms, including the potential need for guaranties. In the presence of these clear disclaimers, a reasonable consumer would not have been misled by Fletcher's oral representation. The addition of the "Covenants of Guarantor" Clause is not alleged to have caused S.Q.K.F.C. any specific injury. Thus, it cannot contribute to a § 349 claim, as some injury, although not necessarily pecuniary, is necessary for recovery under § 349. *See Hart v. Moore*, 155 Misc.2d 203, 207, 587 N.Y.S.2d 477, 480 (Sup.Ct.1992). Finally, S.Q.K.F.C. cannot rely solely on the addition of the "death of a guarantor" clause to state a claim under § 349. TriCon did not in any way suggest to S.Q.K.F.C. that the sample guaranty forms from the first round of negotiations were controlling when S.Q.K.F.C. contacted it for a second round of loan discussions. In addition, at the time it learned of this term, S.Q.K.F.C. was still free to decline to accept TriCon's terms and to receive a refund of its deposit money (as it did), and to seek more favorable terms with another lender.

Since a reasonable consumer would not have been deceived or defrauded by TriCon's actions, we affirm the district court's dismissal of S.Q.K.F.C.'s § 349 claim.

### III. CONCLUSION

The judgment of the district court is affirmed in its entirety.