THE JORDAN (BERMUDA) INVESTMENT COMPANY, LTD., Plaintiff,

v.

HUNTER GREEN INVESTMENTS LTD., Hunter Green Investments LLC, John Shilling, Ilya Kaminsky, Jonathan Vinnik, International Fund Services (Ireland), International Fund Services, Inc., Investment Management Services Inc., Thomas F. Grizzetti, Mark William Solly, William James Cowell, European Fund Services Limited, Susana Byrne, Rosenman & Colin LLP and Fred M. Santo, Defendants.

**No. 00 CIV. 9214(RWS).**

United States District Court, S.D. New York.

June 19, 2002.

Butler, Fitzgerald & Potter by Raymond
Fitzgerald, New York City, for Plaintiff.

Rosenman & Colin by Joseph Zuckerman, New York City, for Defendants Fred M. Santo and Rosenman & Colin, Pro Se.

Skadden, Arps, Slate, Meagher & Flom by Seth Schwartz, New York City, for Defendants Investment Management Services, Inc., International Fund Services, Inc., International Fund Services (Ireland), European Fund Services Limited, and Thomas F. Grizzetti.

Debevoise & Plimpton by Edwin G. Schallert, Frances L. Kellner, Amy K. Orange, New York City, for Defendant Jonathan Vinnik.

*OPINION*

SWEET, District Judge.

The defendants Investment Management Services, Inc. ("IMS"), International Fund Services (Ireland) ("IFSI"), International Fund Services, Inc. ("IFS"), European Fund Services Limited ("EFS") and Thomas Grizzetti ("Grizzetti") (collectively, the "IMS defendants"), defendant Jonathan Vinnik ("Vinnik"), and defendants Rosenman & Colin LLP and Fred M. Santo ("Santo") (collectively the "Rosenman defendants"), have moved pursuant to Rules 9(b) and 12(b) 6, Fed.R.Civ.P. to dismiss the Amended Complaint of plaintiff The Jordan (Bermuda) Investment Company, Ltd. ("Jordan"). For the reasons set forth below, the motion is granted.

*The Amended Complaint*

The initial complaint in this action (the "Complaint") was dismissed by opinion of this Court on July 18, 2001 (the "July 18 Opinion"), *The Jordan (Bermuda) Investment Co., Ltd. v. Hunter Green Investments Ltd.*, 154 F.Supp.2d 682 (S.D.N.Y. 2001), and the issue presented is whether or not Jordan has cured the previously held defects. The parties and the background of the litigation, including the prior proceedings, were set forth in the July 18 Opinion and will not be repeated here since familiarity with that opinion is presumed.

Count I of the Amended Complaint alleges a Racketeer Influenced and Corrupt Organization ("RICO") claim under 18 U.S.C.1962(b) only against "the Investment Manager Defendants, Administrator Defendants and Director Defendants," which include Vinnik and each of the IMS Defendants, but not the Rosenman defendants.[1] The Amended Complaint asserts that Vinnik and the IMS Defendants "maintained, directly or indirectly, an interest in" Beacon Emerging Debt Fund, Ltd. ("Beacon" or the "Fund") and Beacon Emerging Growth Fund LP ("Beacon Growth") "through a pattern of racketeering activity." (Am. Compl. at ¶ 71).

The Amended Complaint repeats the allegations in the Complaint that there existed a scheme to induce The Jordan Trust[2] to invest $5,000,000 through Beacon by

---

1. The Amended Complaint lists in its discussion of the Investment Manager Defendants the following: Hunter Green Investments Ltd. ("Hunter Green"), Hunter Green Investments LLC ("Hunter Green LLC"), John Shilling ("Shilling"), Ilya Kaminsky ("Kaminsky"), and Vinnik. (Am.Compl.¶¶ 2–6). The Administrator Defendants include: IFSI, IMS, IFS, Grizzetti, and Susan Byrne ("Byrne"). (*Id.* ¶¶ 7–14). The Director Defendants include Mark William Solly ("Solly"), William James Cowell ("Cowell"), and EFS. (*Id.* ¶¶ 15–17). Finally, the Amended Complaint lists as Attor-

ney Defendants Rosenman and Santo. (*Id.* ¶¶ 18–19). The Attorney Defendants are not listed in Counts I and II.

2. The Jordan Trust ("The Jordan Trust" or the "Trust"), organized and existing under the laws of Illinois, is the sole shareholder of Jordan. According to the amended complaint, The Jordan Trust assigned to Jordan all of its claims and rights relating to Beacon. (Am.Compl.¶ 1).

misrepresenting that Beacon Class J common stock (the "Class J shares") existed and that all potential investments would be presented to The Jordan Trust for its consideration and its written approval; by misleading The Jordan Trust as to the types of investments Beacon would make with the Trust's monies; and by omitting to disclose that the Trust's monies would be subjected to the claims and liens of Beacon's creditors. Like the original Complaint, the Amended Complaint also alleges that the defendants refrained from withdrawing the $5,000,000 by continuing to misrepresent the existence of the Class J shares and by concealing the fact that prohibited investments were being made with The Jordan Trust's monies.

One difference between the Complaint and the Amended Complaint is the addition of new allegations (i) that a scheme existed to induce an investor other than The Jordan Trust, Baldwin Enterprises, Inc. ("Baldwin"), to invest $5,000,000 in Beacon on or about July 10, 1997, based on a misrepresentation as to the existence of non-existent "Series 9" shares, and (ii) that a scheme existed to induce that same investor one year later—on or about June 11, 1998—to invest an additional $14,000,000 based on similar misrepresentations in yet another non-existent class of Beacon shares (the "Class H shares").

The Amended Complaint also contains allegations that (i) a scheme existed consisting of the misappropriation of $472,945 of Beacon's money for the benefit of the Beacon Growth to the detriment of Beacon, its creditors, its investors and The Jordan Trust; and (ii) a similar corporate waste scheme existed, which consisted of the misappropriation of $751,384 of Bea-

con's participatory interests in currency instruments for the benefit of United European Securities Ltd., a company affiliated with the IMS defendants, and to the detriment of Beacon, its creditors, its investors, and The Jordan Trust. The Amended Complaint alleges that the alleged corporate waste schemes were separate and apart from the scheme directed specifically at the Trust.[3]

In all other respects, Count I of the Amended Complaint appears to be identical with the allegations of the Complaint, except, as noted earlier, Count I of the Amended Complaint is not brought against and, thus seeks no relief, from the Rosenman defendants.

Count II of the Amended Complaint repeats all of the prior allegations and then alleges that Vinnik and the IMS Defendants (again included within the categories Investment Manager Defendants, Administrator Defendants, and Director Defendants) conducted the operations and affairs of Beacon and Beacon Growth through a pattern of racketeering activity. Count II is not brought against the Rosenman defendants.

Count III alleges a RICO conspiracy claim against the Rosenman defendants and all of the other defendants. After realleging all of the prior allegations, Jordan alleges that the defendants "unlawfully and wilfully conspired, combined, confederated and agreed with each other to violate 18 U.S.C. § 1962(b) and/or (c)" and that as "part of and in furtherance of this conspiracy, each of the defendants committed two or more predicate acts, agreed to the commission of two or more predicate acts by some member of the conspiracy or knew, or should have known, that the

---

**3.** In the July 18 Opinion, it was stated that in the Complaint and in Jordan's brief in opposition to the motions to dismiss, the Complaint contended that the corporate waste schemes

were part and parcel of the primary scheme to defraud The Jordan Trust. *See Jordan,* 154 F.Supp.2d at 691.

predicate acts were part of a pattern of racketeering in violation of 18 U.S.C. § 1962(b) or (c)." (Am.Compl.¶¶ 83–84).

The Amended Complaint also alleges four common law fraud counts (including concerted action, conspiracy, and aiding and abetting), negligent misrepresentation and omission, four counts of breach of fiduciary duty, negligence, and conversion, all of which are identical to the allegations of the original Complaint. The Amended Complaint also adds a new claim under New York's Consumer Protection Law, Section 349 of the General Business Law. As to the state law claims, the Amended Complaint alleges diversity and supplemental jurisdiction.

The instant motions to dismiss were filed on October 5, 2001. The parties submitted briefing papers through January 2001, and argument was held on February 13, 2002, at which time the motions were deemed fully submitted.

### Discussion

### I. *Standards for Motion to Dismiss*

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), a court must view the complaint in the light most favorable to plaintiff and accept all allegations contained in the complaint as true. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Annis v. County of Westchester*, 36 F.3d 251, 253 (2d Cir.1994). A complaint should not be dismissed for failure to state a claim unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (*citing Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

To the extent the claims in Jordan's Amended Complaint are based on allegations of fraud, they must also satisfy the pleading requirements of Fed.R.Civ.P. 9(b), which states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Thus, to satisfy Rule 9(b), the Amended Complaint must "adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989).

### II. *The RICO Claims Are Dismissed*

Section 1962 of RICO prohibits (a) the use of income "derived … from a pattern of racketeering activity" to acquire an interest in, establish, or operate an enterprise engaged in or affecting interstate commerce; (b) the acquisition of any interest in or control of such an enterprise "through a pattern of racketeering activity;" (c) the conduct or participation in the conduct of such an enterprise's affairs "through a pattern of racketeering activity;" and (d) conspiring to do any of the above. *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 465 (2d Cir.1995), *cert. denied*, 518 U.S. 1017, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996).

In its Amended Complaint, Jordan has repeated its allegations from the original Complaint that certain defendants committed RICO violations within the meaning of 18 U.S.C. §§ 1962(b), (c), and (d). The IMS Defendants and Vinnik have been named in the Section 1962(b) and (c) substantive claims, and all defendants, including the Rosenman defendants, have been named in the Section 1962(d) conspiracy claim. For the reasons that follow, each of these claims must be dismissed.

## A. *The RICO Claims Are Barred By 18 U.S.C. § 1964(c)*

Each of the defendants has appropriately argued that the conduct Jordan alleges in its RICO claims, which Jordan alleges constitutes mail and wire fraud, is actionable as fraud in the purchase or sale of securities and therefore these claims are barred by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 18 U.S.C. § 1964(c).

The PSLRA amended RICO by removing securities fraud as a predicate act in civil suits. As amended, Section 1964(c) now provides:

> Any person injured ... by reason of a violation of Section 1962 of this chapter may sue therefor ... *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of Section 1962.*

18 U.S.C. § 1964(c) (emphasis added). In amending RICO, Congress was clear in stating that the PSLRA "was meant to eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim." *Mezzonen v. Wright,* No. 97 Civ. 9380(LMM), 1999 WL 1037866, at *4 (S.D.N.Y. Nov. 16, 1999) (citing Joint Explanatory Statement of the Committee of Conference, in H.R. Conf. Rep. No. 104–369, reprinted in 1995 U.S.C.C.A.N. 730, 746); *see also ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.,* 957 F.Supp. 1308, 1319 (S.D.N.Y.1997) (legislative history was "unequivocal in stating that where allegations of mail and wire fraud derive from conduct otherwise actionable as securities fraud, no RICO claim will lie"); *Krear v. Malek,* 961 F.Supp. 1065, 1074 (E.D.Mich.1997) ("It is abundantly clear that Congress intended that conduct constituting wire and mail fraud not form the basis of a predicate act under the amendment if such conduct would also be actionable as securities fraud.").

The defendants argue that the transaction described in the Amended Complaint qualifies as one involving a "security," which, as defined in the Securities and Exchange Acts of 1933 and 1934, includes an "investment contract." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). An investment contract is "anything that investors purchase with '(1) an expectation of profits arising from (2) a common enterprise that (3) depends upon the efforts of others.'" *SEC v. Banner Fund Int'l,* 211 F.3d 602, 614 (D.C.Cir.2000) (*citing SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)). As the Supreme Court stated in *Howey,* this definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 293, 66 S.Ct. 1100.

█ Here, the facts as alleged in the Amended Complaint indicate that an investment contract existed. Jordan claims that the Trust purchased five million dollars worth of "shares" of Beacon and that these funds were to be "invested" on an "unleveraged" basis. (Am.Compl.¶¶ 26, 27, 30, 34, 38, 42). It is undisputed that this investment was intended to produce a profit. Pursuant to this plan, Jordan claims that it executed a subscription agreement, relying in part on Beacon's private placement memorandum (the "PPM"), which warned that Beacon used a "high-risk" investment strategy. The fact that Jordan has not attempted to plead a federal securities claim in connection with its losses resulting from this agreement does not mean that it can instead assert a RICO claim.

Jordan seeks to avoid 18 U.S.C. § 1964(c) on the grounds that the second and third requirements for an investment contract have not been met since the trust did not invest in a common enterprise and Jordan made "all investment decisions." (Pl. Mem. at 10). However, this argument is belied by the pleadings.

"Courts in this Circuit have held that the commonality requirement is met by either horizontal commonality, where investors' funds are pooled, or by narrow vertical commonality, where the fortunes of the investor and the investment manager are interdependent." *Dooner v. NMI Ltd.*, 725 F.Supp. 153, 158 (S.D.N.Y.1989) (citations omitted). Where strict vertical commonality exists, "the fortunes of plaintiff and defendants are linked so that they rise and fall together." *Id.* at 159.

Although Jordan argues that horizontal commonality did not exist because it did not agree to invest in a common fund, its allegations state that, while Beacon issued it a special class of shares, these shares were "already existing shares" that were part of the fund as a whole. (Am. Compl.¶ 38). The Amended Complaint does not allege that only Jordan would have access to these Class J shares, but rather refers to the Class J Supplement, which provides that "[t]he Directors are authorized to allot and issue Class J Shares at any time and upon such terms and conditions as the Fund may determine by resolution of the Directors subject to the aforementioned approval requirement." (*Id.* ¶ 38(b)).

Further, even if one were to accept Jordan's argument that its understanding with Beacon required its shares to be invested separately, there existed vertical commonality. As the July 18 Opinion established, "Beacon was a corporation organized to achieve a high return on interest income by investing in emerging markets." And as Jordan alleges in the Amended Complaint, "[t]he Investment Manager Defendants, the Administrator Defendants and the Director Defendants maintained, directly or indirectly, an interest in Beacon and Beacon Growth ...." [4] Thus, even if Jordan's shares were treated separately from those of other investors, commonality has been established. *See Louros v. Cyr*, 175 F.Supp.2d 497, 508–09 (S.D.N.Y.2001) (allegations that defendants induced plaintiff to wire funds to overseas bank for eventual deposit into high yield investment program satisfied commonality requirement where defendants guaranteed plaintiff that principal amount would remain intact); *Dooner*, 725 F.Supp. at 156–59 (finding strict vertical commonality where the plaintiff, the only limited partner in LLP, alleged that defendants improperly commingled and pledged his shares of stock).

Despite Jordan's contention that it made all investment decisions, the third prong of the investment contract test is also satisfied. The Honorable Loretta A. Preska faced a similar set of facts in *Louros*, where the plaintiffs alleged a RICO scheme involving a "high yield investment program." 175 F.Supp.2d at 505. In that case, plaintiffs alleged that defendants told them that they would have "full control over their funds at all times" and that they would have "sole control over the[ir] account." *Id.* Judge Preska, nevertheless,

4. It should be noted that Jordan's insistence that commonality did not exist is also cast into doubt by the PPM issued by Beacon to The Jordan Trust, one of the documents on which Jordan has relied in its Amended Complaint. The PPM states that "[f]or its services in managing the Fund's investments and other affairs, the Investment Manager and the Sub–Advisors will, in the aggregate, receive ... a semi-annual 'Performance Fee', equal to 20% of the Trading Profits ... of each Series of Shares." (IMS Mtn Ex. 4, at 5).

held that the plaintiffs alleged a securities investment contract, which 18 U.S.C. § 1964(c) precludes from giving rise to a RICO claim, because plaintiff participated in a trading program "[p]resumably ... to receive profits from the efforts of [defendant] in this common enterprise." *Id.* at 509. The same reasoning applies here. *See also SEC v. Aqua–Sonic Products Corp.*, 687 F.2d 577, 578, 579 (2d Cir.1982) (finding investment contract where, under sales agency agreement, "the licensee retained the right to cancel at any time ... ultimate control over pricing and other conditions relating to orders, and the right to inspect the relevant records"); *SEC v. Galaxy Foods, Inc.*, 417 F.Supp. 1225, 1239 (E.D.N.Y.1976), *aff'd*, 556 F.2d 559 (2d Cir.1977) (investment contract exists where individual invests money in a common enterprise and is led to expect profits even in situations where there is some investor's participation).

These same conclusions apply to Jordan's claims regarding Class H and Series 9 shares purchased by Baldwin. Indeed, as to those shares, Jordan does not allege that Baldwin was ever promised that it would have any role in the making of investment decisions or that the terms of the private placement memorandum were to be varied. The prohibitions of 18 U.S.C. § 1964(c) preclude the allegations pertaining to Baldwin's investments from being considered as RICO predicate acts.

**B.** ***A "Pattern" of Racketeering Activity has Not Been Established***

■ Notwithstanding the limitations imposed by Section 1964(c), there is a second basis for dismissing the RICO claims. Jordan has failed to allege a continuing pattern of racketeering activity as required by 18 U.S.C. § 1962.

In order to claim that there has been a violation under § 1962(b) and (c), a plaintiff must allege at least two predicate acts, and those acts must constitute a "pattern" of racketeering activity. *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). A pattern must be established by showing that the defendants' acts are "related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The continuity element "is centrally a temporal concept." *Id.* at 242, 109 S.Ct. 2893. It may be established by alleging either a "closed-ended" pattern, in which the conduct "extended over a substantial period of time," or an "open-ended" pattern, in which the past wrongdoing carried with it the threat of future criminal activity. *GICC*, 67 F.3d at 466.

In considering whether the plaintiffs have met the continuity requirement, it must be determined "which predicate acts were pled with the requisite particularity and what timeframe those acts can be said to span." *CPF Premium Funding, Inc. v. Ferrarini*, No. 95 Civ. 4621(CSH), 1997 WL 158361, at *7 (S.D.N.Y. Apr. 3, 1997). This Court previously found that the original Complaint pled only one scheme and that "[t]aking the most expansive view of the alleged racketeering activity, [it] lasted approximately 22 months, from March 18, 1998 until the last enumerated contact with the Liquidator on February 3, 2000." *Jordan*, 154 F.Supp.2d at 694. In the Amended Complaint, Jordan has sought to expand the duration of the purported scheme, alleging "on information and belief" that additional classes of "non-existent" Beacon Stock—Series 9 shares and Class H shares—were sold to another investor, Baldwin, on or prior to July 10, 1997, and on or prior to June 11, 1998. (Am.Comp.¶ 75). According to Jordan, these other stock sales purportedly were fraudulent because defendants supposedly

represented that the shares existed when upon information and belief they did not exist.

Jordan's inclusion of the sale of stock to Baldwin to allege a pattern is insufficient for purposes of pleading closed-end continuity. The reference to Baldwin relies on unsupported allegations that Baldwin was defrauded by the defendants through acts constituting "racketeering activity." However, to satisfy the particularity requirements of Fed.R.Civ.P. 9(b), it is well-settled that "[a]llegations of fraud cannot ordinarily be based upon information and belief, except as to matters peculiarly within the opposing party's knowledge." *Campaniello Imports Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir.1997) (internal quotations and citation omitted). Even as to those matters, plaintiff's complaint must generally include a "statement of facts upon which the belief is founded." *Id.* Jordan's Amended Complaint, relying on a series of allegations based "on information and belief," pleads no facts explaining the basis of the conclusory allegations that the Series 9 and Class H shares were "nonexistent" and that one or more of the named IMS Defendants made any statement, fraudulent or otherwise, which induced Baldwin to purchase Beacon stock.[5] Thus, the Amended Complaint fails to allege facts sufficient to show that the sales of stock to Baldwin constituted part of any purported pattern of racketeering activity. *See PFT of Am., Inc. v. Tradewell, Inc.*, No. 98 Civ. 6413(RPP), 1999 WL 179358, at *5–6 (S.D.N.Y. Mar. 31, 1999) (dismissing

RICO claim where predicate acts were pled in conclusory fashion entirely on information and belief).

The prior history of the litigation reinforces the conclusion that more than an information-and-belief allegation is required. For instance, on April 18, 2001, Jordan represented to this Court that the Series 9 and Class H shares must have been nonexistent because Beacon purportedly was authorized to issue only five classes of stock designated A through E. In response to this assertion, by letter dated April 24, 2001, the IMS Defendants presented a copy of Beacon's memorandum of association, which provided that each class of Beacon's authorized stock had been divided into 100 Series numbered 1 to 100, and a resolution of the Beacon Board at a meeting held in March 1998 which provided that "the Company is authorized to refer to classes of shares . . . by designations other than their official designations for marketing and other reasons." (IMS Mtn. Ex. B). Under these circumstances, an information and belief allegation is inadequate.

Notwithstanding these deficiencies, the extension of the alleged pattern from 22 months to 30 months is insufficient in itself for purposes of pleading closed-ended continuity given that "acts [occurring] over longer periods do not automatically form a pattern." *First Capital Asset Mgmt. Inc. v. Brickelbush, Inc.*, 150 F.Supp.2d 624, 634 (S.D.N.Y.2001); *see also id.* at 636 ("[T]he fact that acts last over a period of

---

**5.** In defending the Baldwin allegations, Jordan points to Paragraph 74(a) of the Amended Complaint, noting that this paragraph was not alleged on information and belief. However, this paragraph alleges only that one of the purported schemes to defraud Beacon's investors was "the obtaining of money from different investors on at least three separate occasions, based on false representations as

to the existence of shares of Beacon that did not exist and the concealment of the nonexistence of such shares." (Am. Compl.¶ 74(a)). This allegation does not include "specific assertions" such as those of "date, time, place, content and context." *Tavakoli–Azar v. Crescent Mgt., Inc.*, No. 97 Civ. 0696(PKL), 1999 WL 1052016, at *3 (S.D.N.Y. Nov. 19, 1999).

three years is not in itself enough to establish a pattern.") (*citing Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97–98 (2d Cir.1997)). As the Court of Appeals has stated, it is necessary to consider whether the continuity allegations have been satisfied as to each defendant, taking into account its duration and "other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes." *De Falco v. Bernas*, 244 F.3d 286, 321, 322 n. 22 (2d Cir.2001); *see also First Capital*, 150 F.Supp.2d at 635–36. Here, aside from adding unsupported allegations relating to Baldwin, the Amended Complaint does not adequately allege the existence of such other factors that could, under appropriate circumstances, warrant a finding of closed-ended continuity. *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir.1999).

Nor has Jordan adequately alleged open-ended continuity. Jordan asserts that the alleged pattern lasted "in excess of two years, from at least as early as the summer of 1997 and continuing through the present." (Am.Comp.¶ 72). This allegation is substantively the same as that rejected by this Court in the July 18 Opinion, *see Jordan*, 154 F.Supp.2d at 694, and therefore is insufficient as a matter of law to plead "open-ended" continuity. *See Citadel Mgmt., Inc. v. Telesis Trust Inc.*, 123 F.Supp.2d 133, 154–55 (S.D.N.Y.2000); *see also Pier Connection, Inc. v. Lakhani*, 907 F.Supp. 72, 76 (S.D.N.Y.1995) ("A simple statement that the 'scheme continues to date' without more, does not suffice.") (citation omitted).

### C.  *The Amended Complaint Lacks Particulars As to Vinnik*

Defendant Vinnik has brought a separate challenge to the Amended Complaint under Fed.R.Civ.P. 9(b) for lack of particularity. The allegations in the Amended Complaint as they pertain to Vinnik are similar to those set forth in the original Complaint and mention Vinnik once as a director. Otherwise, the Amended Complaint mentions Vinnik in the category of "Investment Manager Defendants" and therefore includes him in the same allegations pertaining to the IMS Defendants.

Rule 9(b) applies to civil RICO claims where, as here, mail or wire fraud is the predicate act. *See S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir.1996); *Citadel*, 123 F.Supp.2d at 154; *Lakonia Mgmt. Ltd. v. Meriwether*, 106 F.Supp.2d 540, 544 (S.D.N.Y.2000). Accordingly, particularity is required in asserting facts showing: (1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mail or transmission facilities in furtherance of the scheme. *See S.Q.K.F.C.*, 84 F.3d at 633. Fraudulent intent is also an indispensable element of any mail or wire fraud allegation. *See id.* at 634.

The allegations against Vinnik do not assert sufficient facts to allege adequately his knowing or intentional participation. While Jordan has alleged that one of the "Investment Manager Defendants," Shilling, made certain statements forming the basis for a fraud claim, the Amended Complaint does not make any specific allegation with respect to Vinnik. This deficiency is an additional ground for dismissing the claims against Vinnik. *See, e.g., DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987) (dismissing the complaint as to certain individual defendants where the derelictions were "pleaded against the defendants generally, with little or no specification as to individual roles."); *Bruce v. Martin*, 90 Civ. 1002(RWS), 1992 WL

204395, at *6 (S.D.N.Y. August 14, 1992) (dismissing a complaint against a director because the complaint contained no allegation particularizing the defendant's role in the alleged fraud); *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 229 (S.D.N.Y.1989) (dismissing securities fraud and RICO claims because complaint only made general allegations against the defendants as a group).

Jordan argues that it may rely on the "group pleading" doctrine in alleging Vinnik's role, thereby obviating the need for particularity as to his participation. That doctrine "allows plaintiffs to 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.'" *Polar Int'l Brokerage Corp.*, 108 F.Supp.2d 225, 237 (S.D.N.Y.2000). However, the doctrine "is extremely limited in scope. Courts in the Second Circuit and elsewhere have construed the doctrine as applying only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions." *Id.* (*citing Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir.1990); *DiVittorio*, 822 F.2d at 1249; *Powers v. Eichen*, 977 F.Supp. 1031, 1041 (S.D.Cal.1997)); *see also In re Indep. Energy Holdings PLC Secs. Litig.*, 154 F.Supp.2d 741, 767–68 (S.D.N.Y.2001).

Jordan has asserted that while Vinnik was not an officer or director of Beacon, the group-pleading doctrine has been extended to "insiders or affiliates participating in the offer of the securities in question" (Pl. Mem. at 34 & n. 13, *quoting*

*DiVittorio*, 822 F.2d at 1247). However, Jordan does not particularize any participation by Vinnik in the offer of Beacon shares. Moreover, while Jordan's opposition brief lists purportedly fraudulent documents upon which Jordan is alleged to have relied (Pl.Mem.32), any specific participation by Vinnik is belied by the pleadings. The Amended Complaint explicitly mentions Shilling as having prepared and sent these documents (Am.Comp.¶¶ 31–37), and alleges that Rosenman and Santo "prepared, or reviewed and approved" one of these documents (*Id.* ¶ 36, 40). In the case of allegedly false Beacon account statements (*Id.* ¶¶ 58, 60), the Amended Complaint alleges that these were sent to Jordan by Byrne, who was an employee "of defendants IFSI, IFS and various other entities affiliated with IFS" (*Id.* ¶ 14), not a Hunter Green Employee, and that "defendants IMS and/or IFS, through IFSI, prepared account statements for Beacon during 1997 and 1998" (*Id.* ¶ 11).[6] In the end, the group-pleading doctrine does not assist Jordan in asserting sufficient facts to allege Vinnik's knowing or intentional participation.

Jordan has also failed to allege that Vinnik acted with the requisite fraudulent intent. This element may be satisfied by pleading that a defendant either engaged in consciously fraudulent behavior or that he had a motive and a clear opportunity to commit fraud. *See Citadel*, 123 F.Supp.2d at 155. Relying primarily on the "consciously fraudulent behavior" prong, Jordan argues that "[t]he Amended Complaint alleges that in order to induce Jordan to transfer $5,000,000 to Beacon, Shilling, Vinnik's [sic] co-director and co-member of the Advisory Committee at Hunter Green,

---

6. Jordan also relies upon the PPM that states that Vinnik lived in Russia and was responsible for "managing Hunter Green's activities in the former Soviet Union" (IMS Mtn Ex. 4, at 19). By contrast, the PPM states that Shilling was responsible for "coordinating relationships with ... investors." (*Id.* at 20). No misstatements are alleged to have been made in Russia.

delivered to The Jordan Trust various group published documents that contained statements that Vinnick [sic] knew were false." (Pl.Mem.37). However, the paragraphs of the Amended Complaint to which Jordan cites do not mention Vinnik. *See In .re Livent, Inc. Secs. Litig.*, 78 F.Supp.2d 194, 219–20 (S.D.N.Y.1999) (finding scienter inadequately pled where, "not once in the paragraphs of the Complaint describing the fraud are any of the Outside Directors mentioned by name"). The paragraphs allege conduct by Shilling, and Paragraph 89 merely notes, in a conclusory fashion, that "defendants knew, or should have known, that such representations were false and deceptive." (Am. Comp.¶ 89).

While Rule 9(b) does not require intent to be alleged with great specificity, it does require specification of particular facts demonstrating the basis for mere conclusory statements. *See Ouaknine*, 897 F.2d at 79–80 ("Allegations of scienter are sufficient if supported by facts giving rise to a 'strong inference' of fraudulent intent"). No facts in the Amended Complaint suggest that Vinnik knew the representations described above were false, or that they were made. *See In re Livent*, 78 F.Supp.2d at 220 (finding that scienter was not adequately pled, in part, because "the Complaint does not allege that the Outside Directors ever saw the agreements memorializing those transactions or were aware of their existence"). All of the cases cited by Jordan disputing this point involve a situation where a court found the scienter element satisfied where a defendant made false representations and had reason to know they were false. *See Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 508 (S.D.N.Y.2001); *Mezzonen*, 1999 WL 1037866, at *13; *Protter v. Nathan's Famous Systems, Inc.*, 904 F.Supp. 101, 106–07 (E.D.N.Y.1995); *Friedman v. Hartmann*, No. 91 Civ. 1523, 1994 WL

97104, at *3 (S.D.N.Y. Mar. 23, 1994); *Morrow v. Black*, 742 F.Supp. 1199, 1204 n. 12 (E.D.N.Y.1990); *United States v. Guadagna*, 183 F.3d 122, 132 (2d Cir.1999).

Jordan also asserts that the Amended Complaint alleges Vinnik's role in providing misleading account statements. However, the paragraphs to which Jordan cites (Am.Comp.¶¶ 56–61) make reference only to "the Investment Manager Defendants, Administrator Defendants and Director Defendants" (*Id.* ¶¶ 56–57) and to Byrne's role in transmitting the account statements (*Id.* ¶¶ 58, 60). Moreover, the Amended Complaint specifically alleges that the IMS Defendants prepared the account statements. (*Id.* ¶ 11). That Vinnik was a member of the Advisory Committee, which was "involved in" providing Jordan with allegedly fraudulent account statements, is not dispositive. *See Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 Civ. 3374(RPP), 1999 WL 101772, at *17 (S.D.N.Y. March 1, 1999) (refusing to infer knowledge of material misstatements where complaint alleged "no facts other than that [the defendant] was a director, a member of the audit committee, and a signatory of the 10–K form" and did not allege facts demonstrating that he "knew at the time that the statements were false"); *Bruce*, 1992 WL 204395, at *6 (refusing to infer intent merely from defendant's membership on committee).

## III. *Diversity Jurisdiction Is Absent and the State Claims are Dismissed*

Having dismissed Jordan's RICO claims, there remains the question of subject matter jurisdiction over the state law claims in Counts IV through XV. Jordan relies on the diversity statute, 28 U.S.C. § 1332(a) as the basis for subject matter jurisdiction. According to that statute, jurisdiction exists where the matter in controversy ex-

ceeds $75,000, and where the action is between "(1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state," and "(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties." 28 U.S.C. § 1332(a).

■ Jordan is neither a citizen of a state nor a subject of a foreign state within the meaning of 28 U.S.C. § 1332(a). The Second Circuit has held that Bermudian corporations, such as Jordan, are not "citizens or subjects of a foreign state" within the meaning of 28 U.S.C. § 1332(a)(2), because the United States does not recognize Bermuda, a British Dependent Territory, as a foreign state. *See Koehler v. Bank of Bermuda (New York) Ltd.*, 209 F.3d 130, 139 (2d Cir.2000), *amended*, 229 F.3d 424 (2d Cir.2000). *See also Matimak Trading Co. v. Khalily*, 118 F.3d 76, 79–82 (2d Cir.1997), *cert. denied*, 522 U.S. 1091, 118 S.Ct. 883, 139 L.Ed.2d 871 (1998) (Hong Kong corporation was not a citizen or subject of a foreign state under § 1332(a)(2) because at the time of the suit, Hong Kong was a British Dependent Territory); *Chase Manhattan Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 251 F.3d 334, 336–37 (2d Cir.2001) (*citing Koehler* and *Matimak* and holding that British Virgin Islands corporation could not sue in federal court based on alienage jurisdiction because the British Virgin Islands is a British Dependent Territory); *Universal Reinsurance Co., Ltd. v. St. Paul Fire & Marine Ins. Co.*, 224 F.3d 139, 140–41 (2d Cir.2000) (Bermuda corporation could not sue in federal court on the basis of alienage jurisdiction).

Jordan has alleged that its principal place of business is in Illinois and therefore it should be considered a citizen of that state for diversity purposes. However, "for purposes of alienage jurisdiction, a corporation is a citizen or subject of the entity under whose sovereignty it is created." *Koehler*, 209 F.3d at 139 (*citing Matimak*, 118 F.3d at 78). Although § 1332(c)(1) deems a corporation to be a citizen both of the state where it is incorporated and where it has its principal place of business, Jordan has sought to remove the place of incorporation entirely from the analysis of diversity. This reasoning runs contrary to that of the Court of Appeals in cases involving traditional sovereignties, *see e.g., Creaciones Con Idea S.A. de C.V. v. Mashreqbank PSC*, 232 F.3d 79, 82 (2d Cir.2000); *Franceskin v. Credit Suisse*, 214 F.3d 253, 258 (2d Cir.2000), and is questionable in light of the fact that, for purposes of Section 1332(c), the Second Circuit has "suggested that alien corporations are not citizens of the state in which they have their principal place of business." *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir.1980) (*citing Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 628 n. 5 (2d Cir.1976)).

■ This question need not be resolved for even if Jordan were considered to be a citizen of Illinois, the presence of Kaminsky, alleged to be a citizen of the United States and a resident of the United Kingdom, defeats diversity jurisdiction, for "United States citizens who are domiciled abroad are neither citizens of any state of the United States nor citizens or subjects of a foreign state, and § 1332(a) does not provide that the courts have jurisdiction over a suit to which such persons are parties." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 68 (2d Cir.1990); *see also Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 828, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989) ("In order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States and be domiciled within the State."). Quite

simply, "a suit by or against United States citizens domiciled abroad may not be premised on diversity." *Cresswell*, 922 F.2d at 68 (citations omitted); *see also Herrick Co., Inc. v. SCS Communications, Inc.*, 251 F.3d 315, 322 (2d Cir.2001).

For these reasons and those previously stated in the July 18 Opinion, in the absence of a federal claim and diversity jurisdiction, the state law claims are dismissed.

## Conclusion

The defendants' motions are granted, and the Amended Complaint is dismissed with costs and with prejudice.

Settle judgment on notice.

It is so ordered.