**KOMMER, Plaintiff,**

v.

**BAYER CONSUMER HEALTH,**
**et al., Defendants.**

**16 Civ. 1560 (DAB)**

United States District Court,
S.D. New York.

Signed 05/18/2017

James Robert Denlea, Robert Jeffrey Berg, Jeffrey I. Carton, Denlea & Carton LLP, White Plains, NY, for Plaintiff.

Eugene A. Schoon, Kara Lynn McCall, Sidley Austin LLP, Chicago, IL, James Daniel Arden, Sidley Austin LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

DEBORAH A. BATTS, United States District Judge.

Plaintiff James Kommer ("Plaintiff") brings this putative class action against Bayer Consumer Health, Bayer Consumer Care Holdings LLC, Bayer Healthcare LLC, Bayer Corporation, and MSD Consumer Care Inc. (collectively, "Defendants"), alleging violations of New York General Business Law ("GBL") §§ 349 & 350. Defendants move to dismiss the action for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and for lack of standing under Fed. R. Civ. P. 12(b)(1). For the reasons discussed herein, Defendants' Motion to Dismiss is GRANTED.

### I. Background

Unless otherwise noted, the following facts are taken from the Amended Complaint and assumed to be true for purposes of this Motion.

Defendants are in charge of manufacturing, marketing, distributing and selling Dr. Scholl's foot care products, including the

Dr. Scholl's Custom Fit Orthotics Inserts (the "Inserts") at issue in this case. (Am. Compl. ¶¶ 18–27.) Defendants market and distribute this product throughout the United States, including in the State of New York, (Id.)

The Inserts are sold nationwide at various pharmacies and retailers. (Id. ¶ 32.) In many stores, they are marketed and sold alongside a point-of-sale kiosk, the Dr. Scholl's Custom Fit Orthotics Foot Mapping Kiosk (the "Kiosk"), which is placed by Defendants in the retail store. (Id. ¶¶ 5, 33.) The Kiosk features a platform for customers to stand on and a computer monitor at top. (Id. ¶ 33.) The instructions on the Kiosk (the "Kiosk Instructions") direct customers to remove their shoes, step onto the Kiosk platform, and touch the screen to begin; within about two minutes, the system maps the user's data and recommends the best Insert model for the user's feet. (Id. ¶ 34.) Fourteen different models of pre-fabricated, pre-packaged Inserts are stacked on shelves on the side of the Kiosk, and the Kiosk is programmed to always recommend one of the models to the user. (Id. ¶¶ 34, 36.)

The Dr. Scholl's website includes the following description of the Kiosk's function:

> The Dr. Scholl's Custom Fit Kiosk uses Foot Mapping technology to gather different measurements of your feet and recommend the Custom Fit Orthotic Inserts that are right for you.
> How does it work?
> It uses 2,000 pressure sensors to create your unique Foot Map
> What does it measure?
> Your arch type, foot length and pressure points
> Why should I try it?
> It's easy to use and only takes a few minutes.

(Id. ¶ 33.) The Complaint alleges that the arch measurements given by the Kiosk are imprecise, because different Kiosks may display different results for the same individual, depending on the individual's weight and stance while standing on the machine. (Id. ¶ 35.) Further, the Complaint alleges, while arch index "may be one of many factors that could be considered in prescribing an effective orthotic device, relying on this one factor alone is not sufficient to properly ... prescribe a custom fit orthotic." (Id.)

Plaintiff is a resident of Saratoga County, New York, who experiences foot pain. (Id. ¶ 13.) In 2011, Plaintiff discussed his symptoms with a chiropractor, who performed a physical examination on Plaintiff and recommended that Plaintiff be fitted for custom orthotics. (Id.) Plaintiff followed this advice and was fitted for custom orthotics, which cost him approximately $333. (Id.)

In 2014, Plaintiff, in search of a second pair of orthotics, used the Kiosk in a Walmart store in Saratoga Springs, New York. (Id. ¶ 14.) The Kiosk recommended that Plaintiff buy one of the Insert models. (Id.) Plaintiff tried the foot-mapping process a few times, and each time the Kiosk recommended the same model. (Id.) Plaintiff ended up buying the recommended Inserts for $50—a price higher, the Complaint alleges, than other, similar inserts, which sell for about $10 at retail. (Id. ¶¶ 15, 38.)

Plaintiff alleges that he bought the Inserts based on the representations made on the in-store Kiosk, on the Inserts' labels, and in Defendants' television commercials for the Inserts (the content of which is not described in the Complaint). (Id. ¶ 17.) According to Plaintiff, Defendants' marketing led him to believe that the "products he purchased were actually custom fit orthotic inserts individually designed for each of his feet," instead of "standardized, mass produced over-the-counter shoe inserts." (Id.) Plaintiff alleges

that, had he "known the truth," he would not have purchased the products. (Id.) After using the Inserts for several months, Plaintiff's foot pain allegedly increased; whereas with his prescribed orthotics, Plaintiff experienced relief. (Id. ¶ 16.)

In the instant action, Plaintiff seeks to represent a class of consumers similarly harmed by Defendants' allegedly deceptive business practices in marketing and selling the Inserts. (Id. ¶ 45.) The allegations regarding the deceptive nature of Defendants' marketing appear to be two-fold: (1) that it misleads consumers into believing that the Inserts are "functionally equivalent" to orthotics fitted and prescribed by a medical professional, Id. ¶ 30; and (2) that it misleads customers into believing that the Inserts are individualized to a consumer's "unique physical characteristics," and not simply "generic, prefabricated, mass-produced, over-the-counter shoe inserts." (Id. ¶¶ 37, 64.) The specific acts alleged to be misleading include the use of "Custom Fit Orthotic" in the product name, see id. ¶ 36, the Kiosk's use of "pseudo-technology," id. ¶ 35, and the use of designations "such as 'CF440'" on the Insert models—designations which Plaintiff claims are not found on other Dr. Scholl's products, and which "suggest a level of precision and exactitude that is not present in the product." (Id. ¶ 38.) Plaintiff brings claims under GBL §§ 349 and 350, and seeks damages and an injunction. (Id. ¶¶ 54–67.)

## II. Discussion

### 1. Legal Standard

For a complaint to survive a motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the plaintiff must have pleaded "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility," the Supreme Court explained,

[W]hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 556–57, 127 S.Ct. 1955). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotation marks and citation omitted). "In keeping with these principles," the Supreme Court stated,

[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 679, 129 S.Ct. 1937. These well-pleaded factual allegations must tender more than "'a formulaic recitation of the elements of a cause of action'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" Id. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 555, 557, 127 S.Ct. 1955).

In considering a motion under Rule 12(b)(6), the Court must accept as true all factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). However, this principle is "inapplicable to legal conclusions," Iqbal, 556 U.S. at 678, 129 S.Ct. 1937, which, like the complaint's "labels and conclusions," Twombly, 550 U.S. at 555, 127 S.Ct. 1955, are disregarded. Nor should a court "accept as true a legal conclusion couched as a factual allegation." Id. at 555, 127 S.Ct. 1955 (quotation marks and citation omitted). In resolving a 12(b)(6) motion, a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). Courts may also consider documents "integral" to the complaint, such as where the complaint "relies heavily upon its terms and effect." Id. (quotation marks omitted and citation).

On a motion to dismiss for lack of standing pursuant to Rule 12(b)(1), the plaintiff "bears the burden of establishing standing in the same way as any other matter on which it bears the burden of proof." Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011) (internal quotation marks and alteration omitted). Thus, as with a motion under Rule 12(b)(6), the plaintiff "must allege facts that affirmatively and plausibly suggest" that it has standing. Id.; see also Lakonia Mgmt. Ltd. v. Meriwether, 106 F.Supp.2d 540, 544 n.3 (S.D.N.Y. 2000). When a defendant makes a facial challenge to standing at the pleading stage, the court must, as with a motion under Rule 12(b)(6), "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Carter v. HealthPort Technologies, LLC, 822 F.3d 47, 57 (2d Cir. 2016) (quotation marks and citation omitted).

2.  Application

a.  The Court's Consideration of the Arden Declaration

In the Amended Complaint, Plaintiff alleges that he bought the Inserts based, in part, "upon the claims made on ... the Dr. Scholl's Kiosk," which Plaintiff contends were deceptive. (Am. Compl. ¶ 40; see also id. ¶¶ 14, 34.) To this end, the Complaint cites selected language from the Kiosk Instructions. (See id. ¶ 34.) In conjunction with their Motion to Dismiss, Defendants submit a Declaration (the "Arden Declaration") attaching a complete reproduction of the Kiosk Instructions as an exhibit. (Arden Decl. Ex. A.)

█ Because Plaintiff claims that the Kiosk Instructions were a source of the deception at the center of this case—and excerpts language from the Instructions as illustration—the Court finds the full Instructions both integral to the Complaint and incorporated by reference. Thus, it is appropriate for the Court to consider the copy of the Instructions attached to the Arden Declaration in resolving the instant Motion to Dismiss.[1] See Nicosia v. Amazon.com, Inc., 834 F.3d 220, 234 (2d Cir. 2016) ("[Plaintiff] did not attach a copy of the Order Page to his complaint, but the complaint alleges injuries on the basis of the purchases made on Amazon, made possible only via clicking 'Place your order' on the Order Page. Thus, the Order Page ...

---

1. Significantly, Plaintiff does not dispute the authenticity or accuracy of this document.

See Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006).

[was] part of the contract incorporated into the complaint by reference."); Derbaremdiker v. Applebee's Int'l, Inc., 519 Fed. Appx. 77, 78 (2d Cir. 2013) ("[Plaintiff] argues that the district court improperly went beyond the four corners of the complaint to consider the sweepstakes' official rules, which were located on a website referenced in the receipt. ... [T]he complaint refers to these rules and the district court properly deemed them to be incorporated in the complaint."); Fink v. Time Warner Cable, 714 F.3d 739, 742 (2d Cir. 2013) ("A plaintiff who alleges that he was deceived by an advertisement may not misquote or misleadingly excerpt the language of the advertisement in his pleadings.").

b. Plaintiff's Standing to Seek Injunctive Relief

█ Before turning to the merits of the Complaint, the Court must first address Plaintiff's standing to seek injunctive relief.

Defendants argue that Plaintiff lacks standing to seek an injunction because he cannot demonstrate that he is likely to be subjected to the same harm in the future. See City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles."). Indeed, by stating that he would not have bought the Inserts had he "known the truth" about the allegedly deceptive marketing, Plaintiff essentially concedes that he will not buy the Inserts, or be misled by Defendants' marketing, again in the future. The fact that Plaintiff seeks to represent a class of similarly-harmed individuals does not change the analysis. See Nicosia, 834 F.3d at 239 ("A plaintiff seeking to represent a class must personally have standing.").

Plaintiff correctly identifies somewhat of a split among district courts in this Circuit regarding the proper application of Lyons in the consumer protection context. See Chang v. Fage USA Dairy Indus., Inc., 14–CV–3826 (MKB), 2016 WL 5415678, at *4 (E.D.N.Y. Sept. 28, 2016) ("The Second Circuit has not directly addressed whether plaintiffs alleging claims of false or misleading advertising have standing to seek injunctive relief where the action the plaintiffs seek to enjoin is still ongoing."). For his part,, Plaintiff argues that requiring plaintiffs to show that they are likely to repurchase the same product they claim to have been deceived by would eviscerate the effectiveness of consumer protection statutes. In support, Plaintiff cites Belfiore v. Procter & Gamble Co., in which the court, confronted with a similar situation, held that:

Public policy, as well as precedent, supports the rule that Article III standing exists to seek injunctive relief. ... To hold otherwise would denigrate the New York consumer protection statute, designed as a major support of consumers who claim to have been cheated. The only way a consumer could enjoin deceptive conduct would be if he were made aware of the situation by suffering injury. But once the consumer learned of the deception, he would voluntarily abstain from buying and therefore could no longer seek an injunction.

94 F.Supp.3d 440, 445 (E.D.N.Y. 2015); see also Ackerman v. Coca–Cola Co., No. 09 CV 395(DLI), 2013 WL 7044866, at *15 n.23 (E.D.N.Y. July 18, 2013) ("[P]laintiffs have standing to seek injunctive relief based on the allegation that a product's labeling or marketing is misleading. ... To hold otherwise would effectively bar any consumer who avoids the offending product from seeking injunctive relief." (quotation marks omitted) ); Delgado v. Ocwen Loan Servicing, LLC, No. 13-CV-

4427 (NGG), 2014 WL 4773991, at *14 (E.D.N.Y. Sept. 24, 2014).

From a policy perspective, the Court agrees that this line of cases presents the better approach. However, the weight of authority in this Circuit directs a different outcome. See Chang, 2016 WL 5415678, at *4 (collecting cases); Albert v. Blue Diamond Growers, 151 F.Supp.3d 412, 418 (S.D.N.Y. 2015); In re Avon Anti–Aging Skincare Creams and Products Mktg. and Sales Practices Litig., No. 13-CV-150 (JPO), 2015 WL 5730022, at *8 (S.D.N.Y. Sept. 30, 2015). Indeed, the Second Circuit recently held that a consumer lacked standing to seek an injunction where the retailer defendant had stopped selling the challenged product and the consumer did not allege that he intended "to use [the retailer] in the future to buy *any* products, let alone" the type of products at issue in the case. Nicosia, 834 F.3d at 239. Although the facts in this case fall outside the scope of this holding—here, Defendants continue to sell the Inserts in the exact manner challenged—the Complaint fails to demonstrate how Plaintiff is likely to be subject to any future or continuing harm from the Defendant. See id. Thus, absent contrary guidance from the Supreme Court or the Second Circuit, prece-dent requires the Court to conclude that Plaintiff has no standing to seek injunctive relief. See Avon Anti–Aging, 2015 WL 5730022, at *8 ("Some district courts ... have allowed such claims to go forward because the contrary rule would preclude injunctive relief in false advertising cases. ... Article III does not permit this sort of public policy exception." (citations omitted)).

### c. Plaintiff's Claims Under GBL §§ 349 & 350

■ Plaintiff has asserted a claim of deceptive business practices under GBL § 349 and false advertising under GBL § 350. Under either section, a plaintiff must demonstrate that "a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015).[2] Defendants do not dispute the first and third elements, and argue only that Plaintiff has failed to allege that Defendants' conduct was materially misleading.

■ Conduct is materially misleading under GBL §§ 349 and 350 if it is "likely to mislead a reasonable consumer acting

---

**2.** Defendants allege that GBL § 350 claims require that Plaintiff plead an additional element of "actual reliance." (See Defs.' MTD at 11.) As Plaintiff points out, this element appears to have been foreclosed by the New York Court of Appeals's decision in Koch v. Acker, Merrall & Condit Company, 18 N.Y.3d 940, 941, 944 N.Y.S.2d 452, 967 N.E.2d 675 (2012) ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law §§ 349 and 350 claims, it was error. Justifiable reliance by the plaintiff is not an element of the statutory claim."). Post–Koch, some courts have continued to hold that GBL § 350 claims require proof of "actual reliance"—an element arguably excluded from the scope of the Koch holding, see, e.g., Merck Eprova AG v. Brookstone Pharm., LLC, 920 F.Supp.2d 404, 425 (S.D.N.Y. 2013)—while others have held that "neither Section 349 nor 350 require proof of reliance," justifiable or otherwise. New World Sols., Inc. v. NameMedia Inc., 150 F.Supp.3d 287, 330 (S.D.N.Y. 2015) (quotation marks and citation omitted). Nevertheless, the Second Circuit recently described the uniform nature of the tests under GBL §§ 349 & 350, see Orlander, 802 F.3d at 300, and it appears to this Court that no reliance element remains to § 350 claims. In any case, this element simply required a plaintiff to "point to a 'specific advertisement or public pronouncement' upon which" he or she relied, Prue v. Fiber Composites, LLC, No. 11–CV–3304 (ERK), 2012 WL 1314114, at *8 (E.D.N.Y. Apr. 17, 2012), which Plaintiff has done here. (See Compl. ¶ 33.)

reasonably under the circumstances." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). This inquiry is an objective one, which, contrary to Plaintiff's assertions, may be resolved as a matter of law on a motion to dismiss. Fink, 714 F.3d at 741 ("It is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer."); S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp., 84 F.3d 629, 637 (2d Cir. 1996) (affirming dismissal of a GBL § 349 claim "[s]ince a reasonable consumer would not have been deceived or defrauded by [Defendant's] actions."); Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995) ("[The] test ... may be determined as a matter of law or fact (as individual cases require).").

In this case, the Complaint fails to allege conduct likely to mislead a reasonable consumer. Plaintiff's principal allegation is that Defendants' use of the Kiosk "misleads consumers into thinking they are having custom orthotics designed specifically for their physiology," Pl.'s Opp'n at 15, when, "[i]n reality, the Kiosk simply directs consumers to pick one of fourteen numbered, pre-manufactured Dr. Scholl's over-the-counter arch inserts." (Am. Compl. ¶ 5.) At the point that the consumer is directed to select a pre-packaged Insert stacked along shelves on the side of the Kiosk, however, it is no longer reasonable for him to think that he is getting a product "individually designed" for his feet, Am. Compl. ¶ 17: in that moment, the "standardized," "pre-fabricated," and "over-the-counter" nature of the Inserts

has become readily apparent. See id. ¶¶ 4, 17, 37, 64; see also Verzani v. Costco Wholesale Corp., No. 09 Civ. 2117(CM), 2010 WL 3911499, at *2 (S.D.N.Y. Sept. 28, 2010) ("[Plaintiff's] interpretation of 'net weight' as including 16 ounces of shrimp alone is objectively unreasonable because a simple visual inspection of the tray—with its clear plastic top-reveals that shrimp is not the only edible item inside."); Weinstein v. eBay, Inc., 819 F.Supp.2d 219, 228 (S.D.N.Y. 2011) ("[N]o reasonable consumer could plausibly think that StubHub tickets come directly from the Yankees when faced with overwhelming evidence to the contrary."). While a contrary conclusion could be reached if, for example, the consumer was charged money *before* using the Kiosk, this is not what Plaintiff alleges.

Put differently, Plaintiff fails to allege, as he must, that Defendants' materially deceptive practices caused his statutory injury. See Miller v. Wells Fargo Bank, N.A., 994 F.Supp.2d 542, 557 (S.D.N.Y. 2014) ("[T]he causation element is essential: The plaintiff must show that the defendant's material deceptive act caused the injury." (quotation marks omitted and citation) ). Plaintiff's alleged injury is the premium price he paid for the Inserts.[3] According to Plaintiff, "[h]ad [he] known the truth" about the Inserts—that they were "simply standardized, mass produced over-the-counter shoe inserts," and not "orthotic inserts individually designed for each of his feet"—he would never have paid the $50 price for the Inserts. (Compl. ¶ 17.) However, Plaintiff needed only to look at what he was buying to see that it was "standardized," "mass produced," and "over-the-counter": Plaintiff was buying pre-packaged Inserts from a stack of similar Inserts over-the-counter at Walmart.

---

**3.** This is a sufficient allegation of injury at this stage of the litigation. See Kacocha v. Nestle Purina Petcare Co., No. 15-CV-5489 (KMK),

2016 WL 4367991, at *14 (S.D.N.Y. Aug. 12, 2016).

Assuming that a reasonable consumer might ignore the evidence plainly before him "attributes to consumers a level of stupidity that the Court cannot countenance and that is not actionable under G.B.L. § 349." Chiste v. Hotels.com L.P., 756 F.Supp.2d 382, 404 (S.D.N.Y. 2010); see also Weinstein, 819 F.Supp.2d at 228 ("[T]he applicable legal standard is whether a reasonable consumer, not the least sophisticated consumer, would be misled by Defendants' actions.").

Plaintiff alternatively appears to claim that Defendants' marketing of the Inserts leads consumers to believe that the Inserts are the functional equivalent of prescribed, individually-made orthotics. Presumably, Defendants achieve this by (1) "plac[ing] a high technology-looking machine," the Kiosk, in stores, Am. Compl. ¶ 5; (2) naming the products "Dr. Scholl's Custom Fit Orthotic Inserts," Id. ¶¶ 30, 36–37; and (3) giving the Insert models designations "such as 'CF440' to suggest a level of precision and exactitude," where, in fact, none exists.[4] (Id. ¶ 38.)

However, Plaintiff completely fails to mention that the Kiosk Instructions he claims were deceptive also contained the following disclaimer:

> The Dr. Scholl's Custom Fit Orthotic Center uses state of the art technology to measure your feet, but does not diagnose medical conditions. It is not intended to take the place of your podiatrist.

See your podiatrist as needed for diagnosis and treatment of medical conditions.

(Arden Decl. Ex. A.) While disclaimers do not ipso facto sanitize misleading marketing practices, "under certain circumstances, the presence of a disclaimer or similar clarifying language may defeat a claim of deception." Fink, 714 F.3d at 742.

Such is the case here. The disclaimer is printed in reasonably-sized font right at the top of the Instructions, and specifically states that the Kiosk "does not diagnose medical conditions," "is not intended to take the place of your podiatrist," and that the user should see a podiatrist "for diagnosis and treatment of medical conditions." (Arden Decl. Ex. A.) This disclaimer was available to Plaintiff before he made any purchase or even stepped on the Kiosk platform. See Preira v. Bancorp Bank, 885 F.Supp.2d 672, 680 (S.D.N.Y. 2012) ("[A]ll of the terms of the gift card ... were fully disclosed to Plaintiff before she engaged in her first transaction."); cf. S.Q.K.F.C., 84 F.3d at 637 ("In the presence of these clear disclaimers, a reasonable consumer would not have been misled by Fletcher's oral representation.").

Plaintiff claims that this disclaimer is at odds with Defendants' other representations regarding the Inserts, and so only serves to compound a user's confusion. (Pl.'s Opp'n at 17–18.) However, Plaintiff

---

4. Plaintiff does not appear to argue that the Instructions' statement that the Inserts provide relief from pain is itself deceptive. To the extent that he does, however, this language is nonactionable. See Zaccagnino v. Nissan N. Am., Inc., No. 14 Civ. 3690(LLS), 2015 WL 3929620, at *4 (S.D.N.Y. June 17, 2015) ("Like speed and ease for internet service, safety and reliability are desirable qualities for a car. However, promoting a car as generally safe and reliable is too general a representation to be proven true or false."), abrogation recognized on other grounds; In re Scotts EZ Seed Litig., No. 12 CV 4727(VB),

2013 WL 2303727, at *7 (S.D.N.Y. May 22, 2013) ("[D]efendants' representations that EZ Seed is 'WaterSmart'; 'Drought tolerant'; 'Grows Anywhere! Guaranteed!'; 'Makes the Most Of Every Drop'; and 'Grows in Tough Conditions! Guaranteed!' are non-actionable puffery."); Leonard v. Abbott Labs., Inc., No. 10-CV-4676(ADS), 2012 WL 764199, at *22 (E.D.N.Y. Mar. 5, 2012) ("General statements about compliance with safety and quality standards are non-actionable 'puffery' where, as here, they fail to identify specific requirements or standards.").

does not specify when or how Defendants have marketed their Inserts as the "functional equivalent" to prescribed orthotics. Indeed, it is unclear how designations such as "CF440" would lead a reasonable consumer to believe that he was getting over-the-counter inserts comparable to prescribed ones, particularly when Plaintiff does not allege that such designations are unique to, or even typical of, the latter. Nor does Plaintiff provide a theory of how the Kiosk's use of a screen and platform render the marketing inherently deceptive, no matter how "high technology-looking" it may be. To the extent that a consumer may overestimate the function of the Kiosk, however, the disclaimer provides adequate clarification of its capabilities. See Derbaremdiker, 519 Fed.Appx. at 78 ("Notwithstanding Derbaremdiker's arguments to the contrary, these rules do not contradict the statements on the receipt, but rather clarify those statements to the extent they were ambiguous ... Accordingly, a reasonable person would not find the receipt 'materially misleading.'" (citation omitted) ).

Accordingly, Plaintiff has failed to allege that Defendants engaged in a materially misleading business practice, and its claims under GBL §§ 349 and 350 must be dismissed.

### d. Leave to Replead

A court "should freely give leave" to replead "when justice so requires." Fed. R. Civ. P. 15(a)(2). But "it is within the sound discretion of the district court to grant or deny leave to amend. A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (internal citations omitted). Repleading would be futile when the "problem with [the pleader's] causes of action is

substantive." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000).

Plaintiff here does not seek leave to replead. Further, because Defendants' conduct was not materially misleading, amendment would be futile. "The problem with [Plaintiffs'] causes of action is substantive; better pleading will not cure it." Id. Thus, dismissal without leave to replead is appropriate.

### III. Conclusion

For the reasons described above, Defendants' Motion to Dismiss is GRANTED. Plaintiff's Complaint is DISMISSED WITH PREJUDICE. The Clerk of Court is directed to close the docket in this case.

SO ORDERED.